ORIGINAL

# In the United States Court of Federal Claims

FILED
NOV 25 2015
U.S. COURT OF FEDERAL CLAIMS

No. 15-161C
(Filed: November 25, 2015)

| | |
|---|---|
| NICOLE TETZLAFF, Plaintiff, v. THE UNITED STATES, Defendant. | Pro Se Plaintiff; Fair Labor Standards Act; Contract Disputes Act of 1978; Small Business Act; Tort; Administrative Procedure Act; RCFC 12(b)(1); RCFC 12(b)(6); Temporary Restraining Order; Preliminary Injunction; Breach of Contract; Duty of Good Faith and Fair Dealing |

Nicole Tetzlaff, Flagstaff, AZ, pro se.

Eric J. Singley, United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**

**SWEENEY**, Judge

On February 23, 2015, plaintiff in the above-captioned case, appearing pro se, filed a complaint alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206-207, the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 7101-7109, the Small Business Act ("SBA"), 15 U.S.C. §§ 631-6575, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and also alleging other miscellaneous claims, including a breach-of-contract claim. Plaintiff subsequently filed a motion for a temporary restraining order or preliminary injunction. Defendant then filed a motion to dismiss plaintiff's claims pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). For the reasons set forth below, the court grants in part and denies in part defendant's motion to dismiss, and denies plaintiff's motion for a temporary restraining order or preliminary injunction.

## I. BACKGROUND

From 2005 until 2013, plaintiff served as a childcare services provider ("childcare provider" or "provider") in California for the Navy Region Southwest ("NRSW") Child Development Home Program ("CDH Program" or "Program"), which is managed and regulated by the United States Department of the Navy ("Navy").[1] She entered into an express contract with the government to provide, as an independent contractor, childcare services out of her home to the military community. In 2011, plaintiff learned that the CDH Program was following

[1] The court derives the facts in the "Background" section from plaintiff's complaint.

certain regional and naval instructions that she believed were outdated. Thus, in July 2011, she met with the CDH Program's director, Jolly Teofilo, and expressed her concerns with "the amount of control being placed upon" her, and with the "Program's serious deficiencies." Compl. 13. Ms. Teofilo directed plaintiff to her superior, Kathy Flynn of Fleet and Family Services. During plaintiff's telephone call with Ms. Flynn, Ms. Flynn stated that she was plaintiff's boss, and that plaintiff should "stop looking into the Program['s] deficiencies." Id. Plaintiff then went to the NRSW Broadway Complex to speak with Command Master Chief Nancy Hollingsworth. Ms. Flynn, an individual named Cindy Padilla, and one of plaintiff's fellow providers were also in attendance. Plaintiff gave Command Master Chief Hollingsworth, Ms. Padilla, and Ms. Flynn a copy of her questions and concerns regarding the CDH Program. Plaintiff also requested clarification as to why there was no Special Needs Review Board or provider training regarding Epi-pen administration to children with special needs. Further, plaintiff asked about the dress code and "why it was being forced upon [her]." Id. In addition, plaintiff asked why she was required to work 55 hours per week, 'while the parent fee policy . . . stated 'at least 50 hours per week.'" Id. at 14. In response, plaintiff was instructed to "change [her] hours of operation or [her] subsidy would be placed on hold until [she] complied." Id.

Plaintiff further asked about the "additional pay that should be paid to Providers exceeding the common 50 hours of care." Id. She asked about "where [their] overtime pay was going and why [she] was being paid through non-appropriated funds." Id. Ms. Flynn "told [her] not to worry about where [her] pay was coming from." Id. Further, plaintiff was given a list of responses to the questions that she had previously asked Ms. Teofilo.

One week after this meeting, Ms. Padilla and Ms. Flynn created a "subsidy standard operating procedure [("SOP")] to reflect the 55-hour 'required' work-weeks." Id. at 15. On October 6, 2012, Ms. Teofilo sent the new SOP to all CDH Program providers via electronic-mail message, but did not send Operations Naval Instruction ("OPNAVINST") 1700.9E (Sept. 24, 2012),[2] which referenced 50-hour work weeks, until the next day.

Subsequently, Charlotte Veal, plaintiff's CDH Program monitor, made statements on plaintiff's inspection report that plaintiff believed were false. Lydia Ortiz was then replaced as plaintiff's monitor. During plaintiff's January 2013 inspection, Ms. Ortiz "ripped out [plaintiff's] knife drawer, breaking it into pieces on [plaintiff's] floor." Id. at 16. Ms. Ortiz noted on plaintiff's inspection that there was a "broken knife lock," and plaintiff then "covered the cost to repair the drawer." Id. Plaintiff asked Command Master Chief Hollingsworth for assistance, but she stated that she could not help plaintiff because a Navy Inspector General report had been filed and an investigation was ongoing.

During that time, plaintiff's husband was "processing out of the Navy and had not yet received his disability rating." Id. Previously, he suffered a traumatic brain injury while serving overseas, and is now disabled. Plaintiff is his caretaker.

[2] An OPNAVINST is a formally documented lawful order issued by the Chief of Naval Operations at the Navy. These instructions are typically used to establish Navy policy, procedures, and requirements.

During the time that plaintiff provided services to the Navy, a Provider Information Package was sent to all CDH Program providers, including plaintiff. The package required her signature and agreement to the requirements contained therein. If plaintiff did not sign the agreement, her subsidy payment would be terminated. Certification as a provider for the CDH Program is authorized for one year, after which a provider must recertify. Plaintiff received the agreement after she was recertified, but before her date of renewal. Plaintiff was required to sign the agreement, or she would not be allowed to continue as a CDH Program provider.

Further, officials in the CDH Program continuously stated to her that her business would cease to operate and that payment for services that she had already provided would be forfeited if she did not comply with the requirements and SOPs that she received. She was required to post her inspection reports with corrective actions noted, which the families that she served could see. Ms. Teofilo indicated to plaintiff that she would publish plaintiff's name and corrective action in the monthly newsletter if she made a mistake on her subsidy paperwork.

Plaintiff received an IRS Form 1099 every year. In addition, plaintiff was licensed to provide services for eight children at a time. However, she was enrolled in the CDH Program for six children. The number of children that were assigned to her, and thus her resulting income, were at the Navy's discretion. Prospective families were screened and interviewed by the CDH Program office prior to enrollment with plaintiff. A prospective family's total income was reviewed to determine the amount of money that plaintiff would receive on a weekly basis. If a family did not obtain Navy subsidy verification by the CDH Program office, it would not be allowed to receive care from a CDH Program provider.

Plaintiff was required to remain open for eleven hours every day, from 6 a.m. until 5 p.m. She was not allowed to hire others for assistance. Plaintiff was instructed as to what she could not include in her Parent/Provider contract with families. She would receive a warning letter if she did not fly the Navy Program flag outside of her house. As a childcare provider, the requirements of her employment remained the same as she transitioned to different installations. She was required to attend two hours of mandatory monthly training, in addition to the eleven hours that her business was to remain open. Upon leaving the CDH Program in 2013, plaintiff had to "beg and plead" the CDH Program director and Commander, Navy Installations Command ("CNIC") for her Individual Development Plan, which was a log of her training hours. Id. at 34.

Providers were required to reserve their childcare openings exclusively for military dependent children. All childcare referrals had to be received through the Navy Childcare Resource and Referral Office or the Central Enrollment Waiting List. Plaintiff was not allowed to offer her services to the general public.

Of the SOPs that plaintiff was required to follow, one stated that she should detain any service member suspected of being inebriated and withhold their child from them. Many service members who entered her home to pick up their children were armed.

In addition, plaintiff underwent unannounced monthly inspections where corrective actions would be noted. She received pay for federal holidays, but only if she kept her home

open for business on the day preceding and the day after a federal holiday. Although the state of California did not require liability insurance for licensed childcare providers, plaintiff had to obtain a vehicle insurance policy that stated "business use," and she was required to add the Navy as an additional insured party on the policy.

Plaintiff was required to participate in annual physicals that included being tested for sexually transmitted diseases without her knowledge or permission. She was also tested every year for tuberculosis.

At one point, OPNAVINST 1700.9E was revised to allow providers to administer rectal medication in a childcare setting. Plaintiff voiced her disagreement with this practice. She also expressed concern regarding what she believed was the misuse of funds through the CDH Program.

Plaintiff learned of the United States Department of Defense's ("DoD") acquisition process to obtain services from independent contractors like her. She contacted the Defense Contract Management Agency, which executes contracts for the DoD around the world. Plaintiff requested the name and contact information of the contracting officer assigned to her, if one existed, as well as the contract number and a copy of the statement of work. Her request was referred to Denise Randolph, who is responsible for the acquisition process at the Pentagon. Ms. Randolph asked plaintiff for a list of people who were aware of her concerns, which plaintiff sent to her. Ms. Randolph then referred plaintiff back to Ms. Padilla.

During the course of her service as a childcare provider, plaintiff lodged complaints alleging that she had been retaliated against for voicing her concerns. The Navy Inspector General's office was made aware of such complaints. Plaintiff then obtained a copy of the report that the office prepared about her. The report stated that several policy changes had been instituted and adverse administrative actions had been taken against several employees. Having completed her work with the CDH Program, plaintiff now offers her assistance to the CDH Program to aid in correcting what she believes are continued discrepancies in its policies.

## II. PROCEDURAL HISTORY

On February 23, 2014, plaintiff filed suit in the United States Court of Federal Claims ("Court of Federal Claims"). Plaintiff asserts that she is entitled to relief for various violations of the FLSA, the CDA, the APA, the SBA, and "federal antitrust law," as well as for other miscellaneous claims. Id. at 38. Plaintiff filed a motion for a temporary restraining order or preliminary injunction, and defendant filed a motion to dismiss plaintiffs' complaint pursuant to RCFC 12(b)(1) and 12(b)(6). The parties' motions have been fully briefed, and the court deems oral argument unnecessary.

## III. LEGAL STANDARDS

### A. Pro Se Plaintiffs

The Court of Federal Claims holds pleadings of a pro se plaintiff to less stringent standards than pleadings filed by litigants represented by counsel. Haines v. Kerner, 404 U.S. 519, 520 (1972). Courts have "strained [their] proper role in adversary proceedings to the limit, searching . . . to see if plaintiff has a cause of action somewhere displayed." Ruderer v. United States, 412 F.2d 1285, 1292 (Ct. Cl. 1969). Although a pro se plaintiff's pleadings are held to a less stringent standard, such leniency "with respect to mere formalities does not relieve the burden to meet jurisdictional requirements." Minehan v. United States, 75 Fed. Cl. 249, 253 (2007); see also Kelley v. Sec'y, U.S. Dep't of Labor, 812 F.2d 1378, 1380 (Fed. Cir. 1987) ("[A] court may not similarly take a liberal view of that jurisdictional requirement and set a different rule for pro se litigants only."); Bernard v. United States, 59 Fed. Cl. 497, 499 (noting that pro se plaintiffs are not excused from satisfying jurisdictional requirements), aff'd, 98 F. App'x 860 (Fed. Cir. 2004). As the Court of Federal Claims stated in Demes v. United States, "[w]hile a court should be receptive to pro se plaintiffs and assist them, justice is ill-served when a jurist crosses the line from finder of fact to advocate." 52 Fed. Cl. 365, 369 (2002).

### B. RCFC 12(b)

Defendant moves to dismiss plaintiff's complaint pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction, and under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted. When considering either a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), or a motion to dismiss pursuant to RCFC 12(b)(6), the court accepts as true all undisputed factual allegations made by the nonmoving party, and draws all reasonable inferences from those facts in the nonmoving party's favor. Westlands Water Dist. v. United States, 109 Fed. Cl. 177, 190 (2013).

#### 1. RCFC 12(b)(1)

Whether the court has jurisdiction to decide the merits of a case is a threshold matter. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868). The parties, or the court sua sponte, may challenge the existence of subject matter jurisdiction at any time. Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006). The plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject matter jurisdiction. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Brandt v. United States, 710 F.3d 1369, 1373 (Fed. Cir. 2013); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). The plaintiff cannot rely solely on allegations in the complaint, but must bring forth relevant, adequate proof to establish jurisdiction. See McNutt, 298 U.S. at 189. Ultimately, if the court finds that it lacks subject matter jurisdiction, then it must dismiss the claim. Matthews v. United States, 72 Fed. Cl. 274,

278 (2006); see also RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

### 2. RCFC 12(b)(6)

A claim that survives a jurisdictional challenge remains subject to dismissal under RCFC 12(b)(6) if it does not provide a basis for the court to grant relief. Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002) ("A motion to dismiss . . . for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy."). A motion to dismiss for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6) tests the sufficiency of the complaint. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007); see also RhinoCorps Ltd. Co. v. United States, 87 Fed. Cl. 481, 492 (2009) ("A motion made under Rule 12(b)(6) challenges the legal theory of the complaint, not the sufficiency of any evidence that might be adduced."). The United States Supreme Court ("Supreme Court") explained in Twombly the degree of specificity with which a plaintiff must plead facts sufficient to survive such a motion, stating that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555 (citation omitted). Although a complaint need not contain "detailed factual allegations," id., it should contain "enough facts to state a claim to relief that is plausible on its face," id. at 570; see also id. at 555 (noting that "factual allegations must be enough to raise a right to relief above the speculative level"). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Twombly, 550 U.S. at 546. Indeed, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982).

## C. Tucker Act

The ability of the Court of Federal Claims to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941). A waiver of immunity "cannot be implied but must be unequivocally expressed." United States v. King, 395 U.S. 1, 4 (1969). The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States not sounding in tort that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491 (2012). However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S. 392, 398 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).

## IV. DISCUSSION

### A. Defendant's Motion to Dismiss

#### 1. The Parties' Arguments

The court first addresses defendant's motion to dismiss plaintiff's claims. In her complaint, plaintiff alleges that the Navy "failed to structure, document and execute properly an independent contractor relationship with" her and other providers. Compl. 12. She claims that she was "misclassified" as an independent contractor because she was actually regulated in the same manner as an employee. Id. at 17. Further, plaintiff claims that she was required to follow a dress code, and that she had to pay to replace her entire wardrobe to meet it. She also alleges that she was required to work a 55-hour work week, instead of the requisite 50-hour work week laid out in Navy policies.

In addition, plaintiff avers that when she expressed concerns about the Program's "serious deficiencies," she was met with harassment and retaliation. Id. at 13; accord id. at 15. Specifically, she claims, Ms. Veal made false statements on one of plaintiff's monthly inspection reports. In addition, plaintiff alleges, Ms. Ortiz broke plaintiff's knife drawer lock, subsequently attributed the defect to plaintiff, and required plaintiff to cover the cost of its repair. According to plaintiff, Ms. Teofilo threatened to publish plaintiff's name and corrective action in the monthly newsletter if plaintiff made a mistake on her subsidy paperwork. Moreover, plaintiff alleges, the Program continuously informed her that her business would cease to operate and payment for her services would be forfeited if she did not comply with its demands and "inaccurate/outdated standard operating procedures." Id. at 18. Further, although she was licensed to provide services for eight children at a time, her enrollment was limited to six, plaintiff avers. "Every aspect of [her] business was managed and controlled by the" CDH Program and CNIC, plaintiff claims. Id. at 19. Plaintiff avers that she was told what she could and could not put in her Parent/Provider contract, and that she was required to fly the Navy CDH flag outside of her house. She was required to obtain an automobile insurance policy for business use, and to add the Navy as an insured party, despite the fact that the state of California does not require liability insurance for licensed childcare providers, plaintiff alleges. In addition, plaintiff claims, she was not allowed to offer her childcare services to the general public.

Plaintiff also avers that the requirement that she detain any service member who appeared inebriated put her life in danger, as well as those of the children under her care. Further, she was tested for sexually transmitted diseases without her knowledge or consent, plaintiff alleges. In addition, plaintiff claims that of the eleven hours she worked each weekday, she was not paid overtime for the eleventh hour of each day, which she claims totals $407,044.41. Plaintiff also seeks that same amount in liquidated damages. Finally, plaintiff requests "treble damages" for having suffered an "anti-trust injury." Id. at 38. In sum, plaintiff seeks $2,442,266.00 in "FLSA and Anti-trust damages." Id.

In its motion, defendant contends that plaintiff's complaint should be dismissed pursuant to RCFC 12(b)(6) for failure to state a claim, and under RCFC 12(b)(1) for lack of subject matter jurisdiction. Defendant argues that plaintiff fails to provide any relevant statutory provisions or

case law in support of her claims, and that the harms that she alleges do not constitute cognizable legal claims. Further, defendant contends, the court lacks subject matter jurisdiction over retaliation and other tort claims, as well as claims arising under the SBA, the APA, and federal antitrust law.

**2. APA Claims**

The Court of Federal Claims lacks jurisdiction to grant relief pursuant to the APA. See Crocker v. United States, 125 F.3d 1475, 1476 (Fed. Cir. 1997) (noting that the court "lacks the general federal question jurisdiction of the district courts, which would allow it to review the agency's actions and grant relief pursuant to the Administrative Procedure Act"); accord Century Exploration New Orleans, LLC v. United States, 745 F.3d 1168, 1179-80 (Fed. Cir. 2014); Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1370 n.11 (Fed. Cir. 2005). Thus, plaintiff's claims pursuant to the APA must be dismissed for lack of subject matter jurisdiction, pursuant to RCFC 12(b)(1).

**3. SBA and Antitrust Claims**

Plaintiff alleges that the CDH Program "harms market competition and small business[es] owned and operated by women." Compl. 52. She further asserts that "[t]his restriction on small business competition is taking place across state lines and international borders." Id. According to plaintiff, the Navy has violated the SBA, and she has also suffered an "anti-trust injury." Id.

The SBA, 15 U.S.C. §§ 631-657s, sets forth Congress's small business policy and "outlines a framework for small businesses to compete for government contracts." Kabando v. United States, No. 14-562C, 2014 WL 4251548, at *2 (Fed. Cl. Aug. 28, 2014), aff'd, No. 15-5018 (Fed. Cir. Jan. 21, 2015). "These statutes, read together or alone, cannot be fairly interpreted to mandate the payment of money, and consequently [the Court of Federal Claims] lacks jurisdiction to consider" claims alleged under these statutes. Id.; see also Kabando, No. 15-5018, slip op. at 3 ("The Claims Court was clearly correct in concluding that it lacked jurisdiction based on [the plaintiff's] references to the Small Business Act. The statute cannot fairly be read to be money mandating for purposes of § 1491(a)."). Further, "claims for violations of the antitrust laws are not within the scope of the Tucker Act." Smith v. United States, 34 Fed. Cl. 313, 321 (1995). Indeed, "this court does not have jurisdiction to hear claims under the Sherman Act, as the United States federal district courts have exclusive jurisdiction for such claims . . . ." Akinro v. United States, 91 Fed. Cl. 650, 655-56 (2010). Accordingly, plaintiff's SBA and antitrust claims are dismissed under RCFC 12(b)(1).

**4. Tort Claims**

Plaintiff further asserts that she was harassed and retaliated against for raising concerns regarding certain policies, and also that she was subjected to a test for sexually transmitted diseases without her knowledge or consent. Plaintiff states that she is not requesting damages for such conduct. However, to the extent that plaintiff seeks to assert claims based on such conduct, the court lacks jurisdiction over these claims because they sound in tort. Flowers v. United

States, 80 Fed. Cl. 201, 213 (2008) (noting that "this 'court lacks jurisdiction if the essence of the claim lies in tort'" (quoting Cottrell v. United States, 42 Fed. Cl. 144, 149 (1998))). The Federal Tort Claims Act ("FTCA") grants the United States district courts exclusive jurisdiction to hear tort claims against the United States, and, therefore, the proper forum for federal tort claims is a United States district court. See 28 U.S.C. § 1346(b)(1); see also Brown v. United States, 74 Fed. Cl. 546, 549 (2006) ("[T]he FTCA grants exclusive jurisdiction to the United States federal district courts regarding tort claims against the United States Government."). Consequently, the court must dismiss plaintiff's tort claims for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1).

**5. CDA Claims**

Plaintiff also asserts claims pursuant to the CDA. The CDA provides that in the event of a dispute between a contractor and the government "relating to a contract," all contractor claims are to be submitted in writing to the contracting officer for decision and all government claims are to be the subject of a contracting officer decision. 41 U.S.C. § 7103(a). A claim is "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to [the] contract." Federal Acquisition Regulation 52.233-1(c). The claim must be submitted to the contracting officer within six years of its accrual. Id. Although the claim need not "be submitted in any particular form or use any particular wording," it must contain "a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987); see also Transam. Ins. Corp. v. United States, 973 F.2d 1572, 1578 (Fed. Cir. 1992) (noting that "certain 'magic words' need not be used and that the intent of the 'claim' governs"). To determine whether a contractor's demand constitutes a claim, a court must engage in a "logical, common sense analysis" of the demand, Transam. Ins. Corp., 973 F.2d at 1579, taking into consideration the facts and circumstances of the case, Reflectone, Inc. v. Dalton, 60 F.3d 1572, 1575 (Fed. Cir. 1995) (en banc).

Upon receipt of a claim, the contracting officer must issue a written decision containing his or her reasoning for the outcome and advising the contractor of its right to appeal. 41 U.S.C. § 7103(e). If a contracting officer fails to issue a decision "within the required time period" set forth in the statute, the failure is deemed to be a decision denying the claim. Id. § 7103(f)(5). The decision of the contracting officer is final unless the contractor makes an authorized appeal. Id. § 7103(g). A valid claim, a contracting officer's decision or deemed denial, and a proper appeal are all jurisdictional requirements under the CDA. See, e.g., Northrop Grumman Computing Sys., Inc. v. United States, 709 F.3d 1107, 1111-12 (Fed. Cir. 2013); Scott Timber Co. v. United States, 333 F.3d 1358, 1365-66 (Fed. Cir. 2003); James M. Ellett Constr. Co. v. United States, 93 F.3d 1537, 1541 (Fed. Cir. 1996); Paragon Energy Corp. v. United States, 645 F.2d 966, 971 (Ct. Cl. 1981).

In this case, plaintiff alleges that she contacted the Defense Contract Management Agency and requested the name and contact information of the contracting officer assigned to her, if any, as well as the contract number and a copy of the statement of work. Her request was referred to Ms. Randolph, who asked plaintiff for a list of people who were aware of her

concerns, which plaintiff sent to her. Ms. Randolph then referred plaintiff to Ms. Padilla. In addition, plaintiff asserts that she "did not have a Contracting Officer so [she] submitted a writ of demand to the Judge Advocate General in Washington DC with [her] concerns and terms of settlement." Compl. 44.

Based on these facts, there is no indication that plaintiff submitted a written claim to a contracting officer setting forth the basis and amount of her claim. She was not aware of the contracting officer's name or contact information, and indeed, asserts that she did not have one at all. Of the two written documents that she did submit to the Navy, one was to Ms. Randolph, which was referred to Ms. Padilla, and the other was to the Judge Advocate General; none of these individuals were contracting officers. Moreover, the document that plaintiff provided to Ms. Randolph was a list of names of certain individuals—it did not include the basis or amount of her claim.

As described above, submitting a valid claim to the contracting officer is a jurisdictional prerequisite to maintaining a CDA claim. Consequently, because plaintiff does not plead sufficient facts to establish that she submitted a claim to a contracting officer, the court lacks jurisdiction over her CDA claims under RCFC 12(b)(1).

**6. FLSA Claims**

The court possesses jurisdiction over plaintiff's FLSA claims. Abbey v. United States, 745 F.3d 1363, 1369 (Fed. Cir. 2014) ("As the courts have held at the government's urging for three decades, since soon after the FLSA was extended to the federal government by the Fair Labor Standards Amendments Act of 1974, Pub. L. No. 93–259, § 6(a), 88 Stat. 55, 58 (1974), the Tucker Act applies to a claim against the government under the monetary-damages provision of the FLSA, 29 U.S.C. § 216(b)."); accord Beebe v. United States, 640 F.2d 1283, 1288–89 (Ct. Cl. 1981). However, plaintiff does not offer any allegations that constitute cognizable claims under the FLSA. While being required to fly the Navy flag outside of her home, purchase clothes to conform with the Navy's dress code, and detain service members who appeared inebriated may have been inconveniences and even posed hardships for plaintiff, they do not rise to the level of a legal cause of action. In addition, although the court notes plaintiff's concerns regarding the Navy's purported failure to implement updated standards, regulations, and procedures, or to resolve discrepancies therein, plaintiff has not alleged any resulting harm that she suffered that would constitute a legal claim.

Plaintiff also alleges that she was misclassified as an independent contractor, despite being regulated as an employee. She asks the court to reclassify her as an employee, and then award her, inter alia, back pay at a rate of $17.06 per hour, beyond payments that she already received from families and from Navy subsidies. Congress enacted the FLSA "to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'" Barrentine v. Ark.-Best Freight Sys. Inc., 450 U.S. 728, 739 (1981) (footnote omitted) (quoting 29 U.S.C. § 202(a)). "The FLSA imposes minimum wage, overtime, and record-keeping requirements, but the requirements apply only to 'employees.'" Steelman v. Hirsch, 473 F.3d 124, 128 (4th Cir. 2007); see 29 U.S.C. § 206(a)

(2000) (minimum wage); id. § 207 (overtime); id. § 211(c) (record-keeping). The FLSA pertains to employees, but does not extend to independent contractors. Steelman, 473 F.3d at 129 (citing Walling v. Portland Terminal Co., 330 U.S. 148, 152 (1947)). With respect to who constitutes an employee, "[t]he [FLSA] itself provides little guidance on the term's meaning. It defines an employee as 'any individual employed by an employer . . . .'" Steelman, 473 F.3d at 128 (quoting 29 U.S.C. § 203). The Supreme Court explained in Nationwide Mutual Insurance Co. v. Darden that this definition is "completely circular and explains nothing." 503 U.S. 318, 323 (1992).

Consequently, "the existence or absence of an employment relationship is to be ascertained . . . by applying the common-law rules realistically, [namely, by] looking to the substance of the arrangement and giving weight to all relevant factors." Ill. Tri-Seal Prods., Inc. v. United States, 173 Ct. Cl. 499, 518 (1965). These factors include:

> degrees or extent of control which the principal may exercise over the details of the work; whether or not the principal has the right to discharge the individual; opportunity of the individual for profit and loss; investment by the individual in the tools and facilities for work; whether the individual or the principal supplies the tools and places to work; the degree of skill required in the particular occupation; the permanency and length of time the individual is engaged; the method of payment (whether by time or job); whether the work is part of the employer's regular business; and whether the parties believe they are creating an employer-employee relationship or a principal-independent contractor relationship.

Id. (citations omitted).

Here, plaintiff provided childcare services in her home, instead of on the Navy's premises. Additionally, she supplied her own vehicle when offering such services, and paid for its insurance. Further, she entered into an agreement with the Navy that contained the mutual understanding that she was an independent contractor.

Moreover, "[w]hile a combination of factors usually is determinative, a single factor—control exercised by an alleged 'employer' over the individual whose 'employee' status is in question—most often overrides other criteria for determining the presence or absence of an employer-employee relationship." Powers v. United States, 191 Ct. Cl. 762, 768 (1970). The United States Court of Claims, whose precedent is binding on this court, "observed that 'the generally accepted and fundamental test is whether there exists, on the part of the employer, control or a right to control the activities of the alleged employee not only as to the result to be accomplished, but also as to the manner and method of attaining the result.'" Id. (internal citation omitted); accord Edwards v. United States, 144 Ct. Cl. 158, 162 (1958). Indeed, "such relationship (of employer and employee) exists when the person for whom services are performed has the right to control and direct the individual who performs the services . . . as to the details and means by which that result is accomplished." Edwards, 144 Ct. Cl. at 162. In this case, although plaintiff alleges that she was required to comply with general standards that the Navy set forth, ultimately, she directed the manner in which childcare services were provided in her home, including the daily details of such work. Thus, even as she considered several of the Navy's policies objectionable, the Navy did not control and direct the manner in which she

performed the childcare services. Consequently, plaintiff did not constitute a de facto employee, as she alleges. See Hartmann v. Stone, 68 F.3d 973, 981 (6th Cir. 1995) (stating that family childcare providers ("FCC") for the United States Army "are private, independent contractors who set the terms of care with parents within the confines of the regulations[,] . . . includ[ing] the price of the service and the duration of care," especially because "the very existence of an FCC home is dependent on the voluntary action of parents coming forward to participate in the program").

Further, to determine "who qualifies as a federal government employee for various pay and benefit purposes[,] Congress has enacted detailed legislation establishing various categories of employees." Guevara v. INS, 954 F.2d 733, 733 (Fed. Cir.) (unpublished table decision). However, "[w]hatever the category, an individual is not considered to be a federal government employee until he or she has been properly appointed as an employee of the [g]overnment." Id. "Absent proper appointment, an individual cannot claim the benefits and entitlements that accompany federal employment." Id.; see also United States v. Testan, 424 U.S. 392, 402 (1976) ("The established rule is that one is not entitled to the benefit of a position until he has been duly appointed to it." (citations omitted)). Indeed, "[a]ccording to long established [binding] precedent . . . in the United States Court of Appeals for the Federal Circuit [("Federal Circuit")], there is a 'well-established principle that, absent specific legislation, federal employees derive the benefits and emoluments of their positions from appointment rather than from any contractual or quasi-contractual relationship with the government.'" Harrison v. United States, 120 Fed. Cl. 533, 544-45 (2015) (quoting Hamlet v. United States, 63 F.3d 1097, 1101 (Fed. Cir. 1995)); accord Adams v. United States, 391 F.3d 1212, 1221 (Fed. Cir. 2004) ("Like all federal employees, Appellants served by appointment. The terms of their employment and compensation, consequently, were governed exclusively by statute, not contract."); Kania v. United States, 227 Ct. Cl. 458, 464-65 (1981) ("Thus it has long been held that the rights of civilian and military public employees against the government do not turn on contract doctrines but are matters of legal status even where compacts are made."). "Thus[,] questions raised [regarding] the scope of employer/employee definitions under the [FLSA], and the proper interpretation of the . . . test for distinguishing employees from independent contractors, are beside the point." Guevara, 954 F.2d at 733.

In this case, plaintiff expressly states that she was hired by the Navy as an independent contractor, and alleges no facts indicating that she was appointed as an employee. Thus, because plaintiff was never properly appointed as a federal employee, and "[does] not [otherwise] plead[] any basis for [her] entitlement to the status of [a] federal employee for purposes of the FLSA," she cannot be considered a Navy employee, and thus, cannot state any claim pursuant to the FLSA. Id. at 1.

In addition, plaintiff erroneously argues that defendant violated Navy policies and the FLSA by requiring her to work 55 hours per week, instead of 50 hours. The policies that plaintiff quotes indicate that plaintiff is mistaken. Plaintiff cites the third question in the "Child and Youth Program Fee Policy Frequently Asked Questions," which states:

What services will families receive for the new fee ranges?

- Fees include at a minimum 50 hours of care per week and United States Department of Agriculture (USDA) approved meals (breakfast, lunch and a snack).

Pl.'s App. 120. The answer to the question states that care will be provided "at a minimum of 50 hours" per week, where 50 hours is a base line, not a maximum. Id. Thus, being required to work more than 50 hours, such as 55 hours, as plaintiff describes, is not a violation of that policy. Plaintiff also cites OPNAVINST 1700.9E, which provides:

> (5) Hours and days of the week that care will be provided. If the CDH provider is receiving a CDH subsidy for full-time care, the hours of care offered shall be at least 50 hours a week.

Id. at 123. Again, this instruction states that "the hours of care offered shall be at least 50 hours a week," indicating that more hours can be required, and that 50 hours of work is a floor, and not a ceiling. Id. In addition, plaintiff references OPNAVINST 1700.9D (Oct. 27, 1994), which states:

> 14.1.2 Under normal circumstances, the maximum length of time a child is in care shall not exceed 10 hours.
>
> - The commanding officer may waive this policy on a case-by-case basis for individuals who regularly work long hours and cannot be accommodated in FCC.
>
> - Parents who occasionally work extended hours may make arrangements, through the chain of command, with the CDC administration to extend past 10 hours when required.

Id. at 125. This instruction provides that typically, an individual child will not be under the CDH Program for more than ten hours in one day, but that this policy can be waived or extended as needed. Although providing care for one child for ten hours is the norm, this instruction indicates that the ten hours can be exceeded, contrary to plaintiff's allegation that providing care for ten hours is a maximum. Further, while the instruction describes ten hours as being the typical amount of care provided to one child in a day, it does not indicate in any way that that is the maximum amount of hours that a provider like plaintiff will work. Under this instruction, one child can hypothetically arrive for care at 6 a.m., and be picked up ten hours later, while another can be dropped off at 7 a.m., to be picked up ten hours after that. Under that scenario, the provider would work for eleven hours during the day without violating this policy. Thus, plaintiff's contention that this instruction precluded providers from working longer than ten hours a day has no basis. Moreover, her allegation that being required to work 55 hours per week violated any policies or statutes lacks merit. Accordingly, plaintiff's FLSA claims are dismissed pursuant to RCFC 12(b)(6) for failure to state a claim upon which the court can grant relief.

### 7. Breach of Contract Claim

Plaintiff alleges that she entered into an express contract with the Navy, providing services as an independent contractor. It is well settled that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts § 205 (1981). The covenant of good faith and fair dealing imposes obligations on the contracting parties, including the duty "not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005). Further, government employees are presumed to perform their duties in good faith. See Torncello v. United States, 681 F.2d 756, 771 (Ct. Cl. 1982); Asco–Falcon II Shipping Co. v. United States, 32 Fed. Cl. 595, 604 (1994). Thus, in order to state a claim premised on a violation of the implied covenant of good faith and fair dealing, "plaintiffs must allege and prove, by clear and strong evidence, specific acts of bad faith on the part of the government." Asco–Falcon II Shipping Co., 32 Fed. Cl. at 604 (quoting Cont'l Collection & Disposal, Inc. v. United States, 29 Fed. Cl. 644, 652 (1993)). A plaintiff must "allege and prove facts constituting a specific intent to injure [the] plaintiff on the part of a government official," Rodriguez v. United States, 69 Fed. Cl. 487, 499 (2006), facts that, "if proved[,] would constitute malice or an intent to injure," S. Cal. Edison v. United States, 58 Fed. Cl. 313, 325 (2003) (citations omitted). The Court of Federal Claims possesses jurisdiction to entertain claims of breach of contract, including claims that the United States violated the implied covenant of good faith and fair dealing. 28 U.S.C. § 1491(a)(1).

Here, plaintiff asserts that when she expressed concerns about the CDH Program, false statements were made on one of her monthly inspection reports. Further, she alleges that her monitor broke her knife drawer lock, and then recorded it on her inspection report as plaintiff's fault and a deficiency. Plaintiff thus alleges sufficient facts to state a claim for a breach of the duty of good faith and fair dealing that survives defendant's 12(b) motion. Defendant's motion is therefore denied as to this claim. Because plaintiff is a non-attorney proceeding pro se, the court provides the following explanation. When ruling on a motion to dismiss under 12(b)(6), the court accepts as true all undisputed factual allegations made by the non-moving party, in this case, plaintiff. Plaintiff should not construe this ruling as a merits ruling, namely, as the court accepting for all purposes the truth of plaintiff's allegations set forth in her complaint. Rather, as this case moves forward, plaintiff must now prove all of the elements of a breach of contract of the duty of good faith and fair dealing in order to prevail.

## B. Plaintiff's Motion for a Temporary Restraining Order or Preliminary Injunction

In her motion for a temporary restraining order or preliminary injunction, plaintiff requests that the court "enjoin[] and restrain[] defendant . . . from the commission of certain acts, particularly set forth and described in [her] complaint." Pl.'s Mot. 1. Further, she asks that the court "order the Navy to immediately cease from requiring all Navy Region Southwest Child Development Home Providers from having [] operating hours of 6am to 5pm [sic], to cease from enforcing 11 hour work days upon these women." Id. at 2.

The Court of Federal Claims cannot entertain claims for injunctive relief, except in four statutorily defined circumstances. See Bowen v. Massachusetts, 487 U.S. 879, 905 & n.40 (1988); Kanemoto v. Reno, 41 F.3d 641, 644-45 (Fed. Cir. 1994) ("The remedies available in [the Court of Federal Claims] extend only to those affording monetary relief; the court cannot entertain claims for injunctive relief or specific performance, except in narrowly defined, statutorily provided circumstances . . . ."); Gonzales & Gonzales Bonds & Ins. Agency, Inc., 490 F.3d 940, 943 (2007). None of those circumstances applies here. See 28 U.S.C. § 1491(a)(2) (providing the court with jurisdiction to issue, "as incident of and collateral to" an award of money damages, "orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records"); id. (providing the court with jurisdiction to render judgment in nonmonetary disputes arising under the CDA); id. § 1491(b)(2) (providing the court with jurisdiction to award declaratory and injunctive relief in bid protests); id. § 1507 (providing the court with jurisdiction to issue declaratory judgment under 26 U.S.C. § 7428). Because plaintiff's request does not fall into one of these exceptions, her motion is denied.

## V. CONCLUSION

Because the court lacks subject matter jurisdiction with respect to plaintiff's APA, SBA, antitrust, and tort claims, they are **DISMISSED** pursuant to RCFC 12(b)(1). Further, because plaintiff fails to state an FLSA claim upon which the court can grant relief, her FLSA claims are **DISMISSED** pursuant to RCFC 12(b)(6). In addition, because plaintiff did not file a claim with a contracting officer, and thus did not satisfy this jurisdictional requirement to maintain a CDA claim, her CDA claims are **DISMISSED** pursuant to RCFC 12(b)(1). Plaintiff had an express contract with the Navy, and sufficiently states a claim for breach of the duty of good faith and fair dealing. Consequently, defendant's motion to dismiss plaintiff's complaint is **GRANTED IN PART** and **DENIED IN PART**. Finally, because plaintiff's request for an injunction does not qualify as an exception to the bar against providing injunctive relief in this court, her motion for a temporary restraining order or preliminary injunction is **DENIED**. Defendant shall file its answer to plaintiff's complaint **by no later than Wednesday, December 30, 2015**.

**IT IS SO ORDERED.**

MARGARET M. SWEENEY
Judge